IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 21, 2021 Session

## NELSON E. BOWERS, II v. ESTATE OF KATHERINE N. MOUNGER

**Appeal from the Circuit Court for Roane County**
**No. 13-CV-76      Michael S. Pemberton, Judge**

_____

### No. E2020-01011-COA-R3-CV
_____

This appeal concerns a real estate transaction that fell through. The Estate of Katherine N. Mounger ("the Estate"), as well as executors Katherine M. Lasater and E. Jay Mounger ("Defendants," collectively), seek reversal of the judgment of the Circuit Court for Roane County ("the Trial Court") whereby they were ordered to return $150,000 in earnest money to Nelson E. Bowers, II ("Plaintiff"), successor in interest to would-be purchaser of the property at issue, McKenzie Loudon Properties, LLC ("MLP"). Defendants appeal to this Court, arguing, among other things, that MLP first materially breached the contract for sale ("the Agreement") by failing to perform a title examination and failing to notify it of a defect in title stemming from oral claims of ownership made by Charles Mounger. However, we find, as did the Trial Court, that the Estate had actual notice of the defect in title. Further, it was the Estate, rather than MLP, that materially breached the Agreement by failing to provide marketable title. Aside from an award to Plaintiff of attorney's fees incurred on an earlier appeal in this matter which Plaintiff did not request from this Court in that earlier appeal, which we reverse, we affirm the judgment of the Trial Court and remand for an award to Plaintiff of reasonable attorney's fees incurred on this appeal as requested.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and CARMA DENNIS MCGEE, JJ., joined.

Daryl R. Fansler and Matthew T. McDonald, Knoxville, Tennessee, and Archie R. Carpenter, Knoxville, Tennessee, for the appellants, the Estate of Katherine N. Mounger, Katherine Mounger Lasater, and E. Jay Mounger.

John P. Konvalinka, John R. Anderson, and Lawson Konvalinka, Chattanooga, Tennessee, for the appellee, Nelson E. Bowers, II.

# OPINION

## Background

Under the Agreement, MLP was to buy a large piece of real property located in Roane County, Tennessee from the Estate. The Agreement was executed on May 9, 2007. Several provisions of the Agreement are relevant to the issues on appeal:

> 3.   Closing.   This transaction shall be closed at a mutually agreeable time and place in Knox County, Tennessee, not later than thirty (30) days from the end of the Due Diligence Period, which Due Diligence Period is one hundred twenty (120) days from the date of this Agreement. In the event Buyer does not terminate this Agreement during the Due Diligence Period, then not later than one (1) day prior to the end of the initial one hundred twenty (120) day Due Diligence Period, Buyer may extend the Due Diligence Period for an additional thirty (30) days by paying to Seller additional Earnest Money of Fifty Thousand Dollars ($50,000) which shall be non-refundable for any reason except for failure of Seller's title or Seller's default thereunder….

> 4.   Conditions to Closing.   The Buyer has one hundred twenty (120) days from the date hereof ("Due Diligence Period") to review:
> (a)   Title;
> (b)   Environmental reviews satisfactory to Buyer in its sole opinion;
> (c)   Conduct soil tests satisfactory to Buyer in its sole opinion;
> (d)   Receive an ALTA boundary and topographical survey satisfactory to Buyer in its sole opinion;
> (e)   That in Buyer's sole opinion adequate utilities are economically available to the Property;
> (f)   Determination by Buyer in its sole opinion that the Property, including soil, does not contain any contamination or hazardous waste and that Property is suitable for residential development or otherwise using septic or other closed wastewater systems; and
> (g)   Such other reviews as Buyer deems necessary and appropriate.

> Buyer shall have all reasonable access necessary during the Due Diligence Period to conduct all reviews of the Property Buyer deems necessary. Buyer shall have the option prior to the expiration of the Due Diligence Period to terminate this Agreement and all obligations of Buyer hereunder. Whether Buyer exercises such right of termination or not, Buyer

shall furnish Seller with copies of all Due Diligence materials without representation or warranty. Except as set forth below in this paragraph, the Earnest Money shall be non-refundable to Buyer. The Buyer shall proceed forthwith within thirty (30) days of the date hereof to cause the title to the Property to be examined by an attorney or title insurance company selected by Buyer and to obtain a title insurance commitment at Buyer's sole expense. In the event that such examination shall disclose any exception to the title to the Property other than the Permitted Exceptions, Buyer shall notify the Seller thereof in writing within ten (10) days of receipt of a title report or title commitment. The Seller shall have thirty (30) days after written notice within which to (a) make said title marketable or to cure or correct any defects in title or to remove any encumbrance that cannot be removed by payment of money out of the purchase price to be paid on Closing of this Agreement; or (b) Seller may advise Buyer that Seller does not intend to cure said defect, in which later event Buyer may cancel this Agreement only within 5 days of receipt of Seller's notice and receive an immediate return of the Earnest Money. Failure to terminate this Agreement as foresaid shall constitute acceptance by Buyer of such defect. Marketable title as used herein shall mean title which a title insurance company licensed in the State of Tennessee will insure at its regular rates, subject only to standard exceptions and matters specified herein. The failure of the Buyer to notify Seller of any title defect within ten (10) days of Buyer's receipt of a written title examination or title commitment showing such exception will constitute Buyer's acceptance of any such exception. Buyer shall furnish Seller with a copy of Buyer's title insurance commitment and any new survey promptly upon receipt of same. The Seller shall have the right to extend the date of Closing for a reasonable period of time not to exceed thirty (30) days to make the title marketable.

***

9.    Failure to Close Remedies.  The Earnest Money, which the Buyer is to pay to the Seller upon the execution of this Agreement, shall be the consideration for the execution by the Seller of this Agreement and shall become the property of the Seller immediately upon the payment thereof subject to the provisions of Paragraph 4 herein. The Seller agrees to apply such Earnest Money toward the purchase price of the Property upon the Closing. If Buyer fails to carry out and perform the terms of this Agreement, except for some permissible reason specified herein or other reason satisfactory and acceptable to Seller, the Seller may retain the Earnest Money and terminate this Agreement, or the Seller may pursue any remedy available

to Seller at law or in equity including without limitation specific performance of this Agreement, but without credit to the Buyer of the Earnest Money to the purchase price and an action for damages, or both. If the Seller defaults in the performance of this Agreement, the Buyer may (i) pursue any remedy available to Buyer at law or in equity including without limitation specific performance of this Agreement and an action for damages or both or (ii) receive a refund of the Earnest Money as its sole remedies. In any such action to enforce the provisions of this Agreement, the successful party shall be entitled to recover his reasonable attorney's fees incurred, and all court costs.

10. Waiver, Modification. Failure by Buyer or Seller to insist upon or enforce any of their rights shall not constitute a waiver thereof or a waiver of strict compliance with the provisions hereof. Either party hereto may waive the benefit of any provision or condition for his benefit contained in this Agreement. No oral modification hereof shall be binding upon the Parties, and any modification shall be in writing and signed by the Parties.

***

14. Time. Time is of the essence of this Agreement.

Upon the execution of the Agreement, MLP paid $100,000 in earnest money to the Estate. On September 5, 2007, MLP gave the Estate a check for $50,000 to extend the Due Diligence Period for an additional thirty days. A problem emerged, however. Charles Mounger, brother to the co-executors of the Estate, stepped forward to assert a claim on the property. Charles Mounger's actions derailed the transaction, and the co-executors of the Estate sued him. In *Mounger v. Mounger*, the trial court found for the Estate, and this Court affirmed the trial court. Setting out the dispute, this Court stated:

Katherine [N]. Mounger died owning several pieces of valuable property. This action arises out of her estate's attempt to sell one particular parcel consisting of approximately 1,200 acres of lakefront property in Roane County ("the Parcel"). Two of Mrs. Mounger's three children, E. Jay Mounger and Katherine M. Lasater, were named executors of her estate ("the Estate"). By and through the executors, the Estate entered into a contract ("the Contract") to sell the Parcel to McKenzie Loudon Properties, LLC, for the price of $15,200,000.

The Contract is dated May 9, 2007. It grants McKenzie a 120–day window to perform its due diligence inquiry. The Contract provides for a 30–day extension of the due diligence period. Closing is to occur within 30 days of the completion of McKenzie's due diligence.

During the due diligence period, an appraiser, who was physically on the Parcel, encountered Charles D. Mounger, Jr. ("the Defendant"), a sibling of the executors. The Defendant informed the appraiser that he owned pieces of property within the Parcel and, in fact, had constructed a home on the Parcel. The Defendant advised that any purchaser would be forced to deal with him and that he would not be easy to deal with. The appraiser informed McKenzie and McKenzie's lender as well as the Estate of his encounter with the Defendant. McKenzie considered the Defendant's claims to be a cloud on the title. After the time expired for closing under the strict terms of the Contract, the Defendant recorded a deed from his mother dated March 27, 1995, purporting to grant him several small tracts within the Parcel.

After several unsuccessful attempts by the Estate and McKenzie to settle with the Defendant so that the sale could go forward, the Estate filed an action in chancery court to clear the cloud on the title and eject the Defendant. The Estate prevailed. The chancery court's judgment is part of the record in the present action. It provides that the Defendant's deed is "void and of no effect" and orders the Defendant "immediately ejected from the property of the [E]state in Roane County...."

After clearing title to the Parcel and ejecting the Defendant, the Estate gave McKenzie a further opportunity to close on the property. McKenzie declined, and the Estate filed the present action alleging that it lost the sale because of the Defendant's wrongful conduct. The Estate also alleged that the market value of the Parcel had decreased greatly. The Defendant answered with denials of almost all allegations of the complaint and asserted "res judicata and estoppel, as affirmative defenses, as to any and all matters determined or could have been determined in the prior litigation between the parties...."

The case was tried to a jury. The Defendant represented himself. The jury awarded the Estate compensatory damages of $6,000,000. The court entered judgment on the jury verdict and later denied the Defendant's motion for new trial.

*Mounger v. Mounger*, No. E2010-02168-COA-R3-CV, 2012 WL 764913, at *1-2 (Tenn. Ct. App. Mar. 12, 2012), *R. 11 perm. app. denied Aug. 16, 2012*.

Meanwhile, even though the transaction had fallen through, the Estate kept the $150,000 of earnest money. In May 2013, Plaintiff—successor in interest to MLP—sued Defendants in the Trial Court, alleging breach of contract and unjust enrichment. Plaintiff sought to recover the earnest money. In July 2016, the Trial Court granted summary judgment to the Estate, finding Plaintiff lacked standing to bring his claims. In *Bowers v. Estate of Mounger*, 542 S.W.3d 470, 483 (Tenn. Ct. App. 2017) ("*Bowers I*"), this Court

reversed the Trial Court's judgment in part holding, among other things, that Plaintiff did have standing. This Court stated that the issue of whether Plaintiff was prevented from recovering the earnest money because MLP failed to take the necessary steps under the Agreement could be addressed by the Trial Court on remand. *Id*. at 486. We observed that "the Estate claims that MLP did not notify the Estate of any claimed defect regarding title to the Property until October 31, 2007. The Estate also maintains that MLP did not provide the Estate with a copy of a title insurance commitment or a copy of the survey required by the Agreement." *Id*. at 474-75.

In September 2018, this matter was tried on remand before the Trial Court in a bench trial. One of the disputed issues on remand was exactly when Defendants became aware of a defect in the property's title. Among the evidence admitted at trial was an August 3, 2007 letter from Defendants' attorney, Archie Carpenter, to Plaintiff's attorney, John Anderson. In full, the letter states:

Dear John:

This is in response to your phone message of yesterday afternoon. The executors of the estate will do their best to keep Charlie or anyone else from interfering with your client's representatives performing the due diligence investigation.

As I mentioned in the message I left to you, if you will obtain an affidavit of the specifics from the geotechnical person who Charlie ran off the property, we will ask the court to restrain such behavior in the future and thus gain access to the court's contempt powers.

I know that your representatives on the site will continue to exercise caution if they again encounter Charlie in the state you have described. On the other hand, we want to do everything possible to allow you free access to the property.

If you think you would like us to proceed with obtaining a TRO, please communicate with my partner, Charles Sterchi, because I will be on vacation for a week, beginning tomorrow.

Very truly yours,
/s/ Archie R. Carpenter

Defendants contend that this letter did not refer to any specific claim by Charles Mounger to the property and cannot be used to show their actual knowledge of a defect in

title at the time. Defendants assert, instead, that they first learned of Charles Mounger's claim on the property at an October 31, 2007 meeting with MLP and subsequently ran out of time to cure the defect; the co-executors testified to this sequence of events. On the other hand, Harlon Rice, who formerly worked for MLP, testified via deposition that he forwarded an email to Katherine Lasater on August 9, 2007 about Charles' on-site confrontation with a surveyor. However, the heading of the email reflects a date of March 24, 2010. Rice accounted for this by stating that he re-sent the email.

Despite Charles Mounger's disruption, the parties remained in communication and made certain efforts to carry forward with the deal, although in the end to no avail. On December 13, 2007, MLP's attorney sent a letter to the Estate stating in part:

> My client is very much interested in moving forward to purchase this property once the title dispute is resolved. It is our understanding that you have filed suit on behalf of the estate to resolve this title issue. My client would very much like to have the written extension finalized and executed which provides a timeframe that it will close no later than ten (10) business days after the resolution of the title dispute with Charles Mounger, Jr. I would appreciate very much your discussion of this issue with your clients. As you know, my client not only incurred substantial survey expense but, also, substantial additional legal expense, offer to increase the purchase price by $500,000.00 and incurred other expenses in an effort to try and resolve this issue with Charles Mounger, Jr. and expedite the closing.

However, no such written extension was forthcoming. In July 2008, Mr. Carpenter wrote to Mr. Anderson advising him that the Estate had prevailed against Charles Mounger in court and was ready to proceed with the sale. Mr. Carpenter also requested a copy of the title examination of the property and survey. Mr. Anderson replied, stating he would ask his client to forward the requested information. The sale never went forward. In December 2008, Mr. Anderson wrote to Mr. Carpenter requesting return of the earnest money paid by MLP based on representations allegedly made on the Estate's behalf and for Mr. Carpenter to deal with Plaintiff going forward. The earnest money never was returned, and the parties dispute whether a promise was ever made to return it. Harlon Rice testified in his deposition that Katherine Lasater had agreed to return the earnest money.

In April 2019, the Trial Court entered its Order of Judgment finding in favor of Plaintiff. In his detailed order, the Trial Court found, in part:

> Charles Mounger, the son of the decedent, as well as the brother of the Defendants Jay and Katherine Mounger, asserted a claim to ownership of some of the property to be sold pursuant to the contract. As set out above,

MLP discovered this during the Due Diligence Period, in either very late July or very early August 2007. There exists no doubt that the Defendants' counsel, Mr. Archie Carpenter, was aware of Charles' behavior because he wrote to Mr. Anderson, counsel for MLP, telling him that the Moungers would do their best to keep Charlie from interfering with MLP's due diligence efforts. Mr. Carpenter went on to request an affidavit from the "geo tech person" and stated that the Moungers would seek a restraining order as to Charlie. While Charlie's claim to own part of the property is not mentioned in Mr. Carpenter's August 3, 2007 letter, it is difficult to believe that such information was not relayed to Mr. Carpenter at the same time as was Charlie's other disruptive behavior. This conclusion is buttressed by further testimony of Mr. Rice, wherein he stated that he informed Ms. Katherine Lassiter of the substance of the email from Mr. Powers. Mr. Rice stated that he and Ms. Lassiter became "friends" through the process and spoke frequently.

***

The proof at trial was abundantly clear that there were numerous failures on the part of the parties to the contract to actually comply with the terms of the contract. Given the amount at issue, i.e., $15,200,000.00, this is somewhat surprising. First, paragraph 3(c) of the Agreement required the estate to deliver merchantable title, free from all liens, deed restrictions, encroachments, easements and encumbrances. Even taking into account the additional $50,000.00 paid by the Buyer to extend the Due Diligence Period, and therefore the time to close, the estate was still required by the terms of the contract to provide marketable title within one hundred and eighty (180) days from the date of the contract. That date was November 6, 2007. It was not until the expiration of Charles Mounger's time to appeal the ruling of the Roane County Chancery Court that the estate could have provided marketable title. This did not occur until approximately August 10, 2008, some 456 days after the contract was entered into. Therefore, it is clear to this court that the estate was unable to fulfill the terms of the contract. It is equally clear to the court that MLP paid $150,000.00 of Earnest Money to the estate. Therefore, the estate breached the contract.

MLP also did not comply with certain terms of the contract. Paragraph 3(c) of the Agreement sets out that if the Buyer obtained a new survey and legal description of the property, the Buyer was required to deliver to the Seller a copy of the survey within five (5) days of receipt by Buyer of the survey. The testimony was clear that this provision of the Agreement was of import to the estate and was the motivation behind it

-8-

agreeing to reduce the Earnest Money from $200,000.00 to $100,000.00. MLP did not deliver the survey in the time period set out in the contract. Therefore, MLP breached the contract in this regard. However, the court does not find this breach to be material…

\*\*\*

The estate argues that MLP breached … [Paragraph 4] by failing to notify it in writing of the defect. The court disagrees in this regard. At this point, there was no recorded defect in the title, at least according to the proof introduced at trial. There was an oral claim being made by Charles Mounger to at least one individual on the site performing due diligence. Additionally, Charles' statements/claims were promptly made known to the estate, as proven by the August 3, 2007 letter from the estate's attorney setting out what actions the estate would take against Charles. Therefore, the court finds that MLP substantially complied with the Agreement as to notice, if indeed that provision was operative at that point. Alternatively, if the failure of MLP to provide written notice constitutes a breach of the terms of the contract, given the manner in which the parties were attempting to deal with the "Charles issue," the courts finds that any such breach would not be a material breach on the part of MLP.

\*\*\*

Despite the good faith efforts of the parties to find some resolution to the cloud placed upon the title by Charles' claim, the parties were unable to do so. After, some correspondence between the attorneys in December 200[7], nothing further of substance transpired until the Roane County Chancery Court voided Charles' Quit-Claim deed on July 10, 2008. Thereafter, the estate offered to close the transaction, but MLP did not accept. As noted above, the Defendants also allege that the Plaintiff Buyer never appeared, gave notice of or scheduled a closing.

Therefore, the Defendants argue the Agreement was never terminated in accordance with the provisions of the contract. The Plaintiff [sic] alleges that transfer of title was offered but there was no response under the contract from the Plaintiff. As also noted above, the first date the Defendants could meet their contractual obligation to provide marketable title would have been approximately August 10, 2008, approximately fifteen (15) months after the execution of the contract and approximately nine (9) months after the contemplated closing of the transaction. As a result, the court is not persuaded by the arguments that the Defendants never terminated the

contract or scheduled a closing after the Defendants finally obtained marketable title.

The Plaintiff argues that Ms. Lassiter reached an Agreement with MLP to return the $150,000.00 Earnest Money. Indeed, the Plaintiff's position is reflected in the letter of December 5, 2008 from attorney Anderson to attorney Carpenter. Mr. Rice testified that Ms. Lassiter had agreed with his request to return the Earnest Money. However, the Defendants correctly point out that there was no proof that the co-executor Jay Mounger agreed to do so and that one co-executor cannot bind another without mutual assent. Therefore, the court is not persuaded by this argument of the Plaintiff.

However, the court is persuaded by the Plaintiff's "equity" argument, namely that the estate still has the property and still has the $150,000.00 of Earnest Money. The court views this as a distinctly inequitable result. As noted above, both parties substantially deviated from the terms of the contract. By noting this, the court is not criticizing either the parties or their counsel. It was abundantly clear to this court that these parties operated in good faith and made substantial efforts to try and deal with the "fly in the ointment," i.e., Charles Mounger and his specious Quit-Claim deed. However, in the end, they were unable to do so.

To permit the estate to retain both the property and the Earnest Money in light of the above would be, in this court's eyes, an unjust result. Therefore, this court finds in favor of the Plaintiff and ORDERS that the estate, through the Defendants, return the Earnest Money.

(Record citations omitted).

Plaintiff's request for attorney's fees was continued. The Trial Court later held a hearing on an award of pre-judgment interest, as well as the reasonableness of Plaintiff's claimed attorney's fees. As pertinent to an issue on appeal, in a July 2020 order the Trial Court explained its rationale for granting Plaintiff an award of attorney's fees incurred on appeal in *Bowers I* even though Plaintiff had not requested such an award from the Court of Appeals:

As to the defendant's argument that the plaintiff is not entitled to fees he incurred on appeal because he did not seek them on appeal, the court disagrees. While *Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406 (Tenn. 2006), certainly held that the plaintiff therein was precluded from seeking attorney's fees because he did not request them on appeal, what this argument fails to note are the procedural differences between this case and *Killingsworth*. First, the plaintiff in *Killingsworth* brought an action pursuant

-10-

to the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq*. which contain a statutory provision for attorney's fees. Here, the basis for attorney's fees is based upon the contract the parties entered.

Second, the plaintiffs in *Killingsworth* had already "won" at the trial level. Here, the appeal by the plaintiff was the result of the erroneous grant of summary judgment to the defendant. Therefore, the rationale of *Killingsworth* is not applicable herein.

As to the defendant's argument that *Raine Bros., Inc. v. Chitwood*, 2017 WL 3090902 (Tenn. Ct. App. May 24, 2016), this court also finds it to be inapplicable as well. In *Raine Bros.*, like *Killingsworth*, the plaintiff had already obtained a judgment and the trial court had denied a recovery of contractual attorney's fees. Therefore, the factual posture of *Raine Bros*. was much different than the facts herein. Therefore, this court finds the rationale of *Raine Bros*. to be inapplicable.

Defendants filed a notice of appeal to this Court. In September 2020, the Trial Court entered its Amended Order of Final Judgment for Attorneys' Fees, clarifying that it was awarding Plaintiff a total of $206,620.25 in attorney's fees incurred as of July 1, 2020.

## **Discussion**

Defendants raise the following issues on appeal: 1) whether the Trial Court erred in ruling in favor of Plaintiff when it found that both parties breached the Agreement; 2) whether the Trial Court erred in applying equitable principles to award Plaintiff the earnest money in a breach of contract case; and, 3) whether the Trial Court erred in awarding Plaintiff attorney's fees incurred in the appeal of *Bowers I* when Plaintiff did not seek recovery of those fees in this Court in that appeal. Plaintiff raises the following separate issues: 1) whether the Trial Court erred by not concluding the Agreement expired in accordance with its own terms requiring the Estate to return the earnest money; 2) whether the Trial Court erred in concluding one co-executor could not bind the Estate; and, 3) whether Plaintiff is entitled to attorney's fees on this appeal.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Regarding witness credibility, our Supreme Court has stated:

-11-

When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ––– U.S. –––, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014). However, "appellate courts are not required to give similar deference to a trial court's findings of fact based on documentary evidence such as depositions, transcripts, or video recordings." *Id.* at 693.

We first address whether the Trial Court erred in ruling in favor of Plaintiff when it found that both parties breached the Agreement. Defendants present three sub-arguments on this issue: (1) the Trial Court failed to determine which party committed the first material breach; (2) contrary to the Agreement, MLP failed to obtained a title examination within 30 days of the execution of the Agreement, which constituted the first, uncured material breach; and, (3) the Trial Court erred in concluding that the notice provided by MLP was in "substantial compliance" with its obligations under the Agreement. These issues present questions of contract interpretation and what constitutes a material breach of contract. In *Segneri v. Miller*, No. M2003-01014-COA-R3-CV, 2004 WL 2357996 (Tenn. Ct. App. Oct. 19, 2004), *R. 11 perm. app. denied March 21, 2005*, this Court observed that:

"The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The purpose of interpreting a written contract is to ascertain and give effect to the contracting parties' intentions, and where the parties have reduced their agreement to writing, their intentions are reflected in the contract itself. *Id.*; *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). "The intent of the parties is presumed to be that

specifically expressed in the body of the contract...." *Planters Gin Co.*, 78 S.W.3d at 890. Therefore, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano*, 995 S.W.2d at 95; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975).

*Segneri*, 2004 WL 2357996, at *4.

In *Adams TV of Memphis, Inc. v. Comcorp of Tennessee, Inc.*, 969 S.W.2d 917 (Tenn. Ct. App. 1997), this Court noted that in order for a contractual breach to be sufficient to relieve the non-breaching party of its contractual obligations, the initial breach must be "material." In *Adams TV*, we affirmed the trial court's dismissal of a breach of contract claim because the alleged breach was not material. In so doing, we stated:

Upon consideration of the motions to dismiss, the trial court found, and we agree, that any breach of the terms of the Adams TV - ComCorp contract was not a material breach so as to warrant non-performance of the contract by Adams TV. In determining whether a breach of contract is material such that the non-breaching party could avoid performance, Tennessee courts have adopted the criteria established in the Restatement (Second) of Contracts, § 241 (1981), which enumerates the following factors to consider:

(1) The extent to which the injured party will be deprived of the expected benefit of his contract;

(2) The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(3) The extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(4) The likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and

(5) The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

-13-

> *See, McClain v. Kimbrough Constr. Co., Inc.*, 806 S.W.2d 194, 199 (Tenn. App. 1990).

*Adams TV*, 969 S.W.2d at 921.

With respect to Defendants' first sub-argument, Defendants are correct in that the Trial Court did not explicitly state that the Estate committed the first material breach of the Agreement.  However, we agree with Plaintiff that "it is clear by implication and context of its Order that [the Trial Court] found the Estate committed the first and only material breach."  The Trial Court found that both MLP and the Estate breached the Agreement.  It then found MLP's instances of breach non-material.  The Trial Court thus contrasted MLP's non-material breaches of the Agreement with what it found, necessarily by implication, to be the Estate's material breach of the Agreement in its failure to produce marketable title to the property at issue.  While the Trial Court did not state outright that the Estate committed a material breach, it is clear from the context of the Trial Court's ruling that it found just that.

With regard to Defendants' subargument (2), Defendants correctly note that there is no indication in the record that MLP ever performed a title examination.  In response, Plaintiff argues in his brief that an application of the five Restatement factors, quoted above, supports his contention that MLP's failures to abide by the Agreement were non-material and, in contrast, the Estate's failure to provide marketable title constituted a material breach.  As Plaintiff asserts, "the title examination was for the benefit of MLP." Indeed, it was.  The point of the Agreement was not to perform a title examination; it was to sell the land at issue for a sum of money.  Implicit in that bargain was that the land to be sold belonged to the seller—the Estate—without any other claimants to it in the wings. MLP's apparent decision to forego a title examination was to its own potential detriment, not the Estate's.  In fact, even if MLP had timely performed a title examination, it would not have yielded a defect as Charles Mounger had not yet recorded his purported deed.  The defect in this case stemmed, initially, from Charles Mounger's oral claims of ownership to some portion of the property.  Charles Mounger's actions cast a cloud on the title, albeit one that would not have been discovered in a title examination at first.

While MLP's apparent failure to conduct a title examination was to its own potential detriment, the Estate's failure to produce marketable title was very much detrimental to MLP's expected benefit under the Agreement.  MLP reasonably expected free and clear title to the property from the Estate. Defendants point to *Seaton v. Wise Properties–TN, LLC*, No. E2011-01728-COA-R3-CV, 2012 WL 2362144, at \*7 (Tenn. Ct. App. June 22, 2012), *Rule 11 perm. app. denied Oct. 16, 2012*, for the proposition that, in a 'time is of the essence' real estate contract such as the Agreement, failure of a party to perform a title

examination within the time set out in the contract constitutes failure to perform a condition precedent and amounts to material breach. In *Seaton*, we stated in part:

> As found by the trial court, it is undisputed that the Seatons did not order a title examination within ten days of January 30, 2008, and never issued a title commitment. "[A] vendor ... guilty of failure to perform a prerequisite condition ... is not in [a] position to rely upon any failure to perform by the vendee." *Nichols v. Blocker*, No. 87-110-II, 1988 WL 39569, at \*5 (Tenn. Ct. App. Apr. 29, 1988). The Seatons did not act in accordance with this requirement of the Agreement, especially since every date specified or established in the Agreement was "of the essence." Given that the failure to timely perform contractual obligations where "time is of the essence" constitutes a material breach, and that timely performance is a condition precedent under such clauses, Wise was entitled to rescind the Agreement and the Seatons, as a matter of law, cannot compel Wise to perform. *Groner*, 2000 Tenn.App. LEXIS 270 at \* 10-11, 2000 WL 502843. The material breach by the Seatons thus preceded Wise's decision to stop payment on the earnest money check, and gave Wise the ability to "terminate" the contract. *Akins v. Tedder*, 1988 Tenn.App. LEXIS 648, \*8-9, 1988 WL 109150 (Tenn. Ct. App. Oct. 21, 1988).

*Seaton*, 2012 WL 2362144, at \*7.

We find *Seaton* inapposite. In *Seaton*, it was the seller who had the responsibility of performing a title examination. Here, the buyer, MLP, had that responsibility. MLP's apparent choice to forego a title examination, when such an examination was for its own benefit, is not comparable to the scenario in *Seaton*. Meanwhile, the Estate's failure to provide marketable title was very much to MLP's detriment, and went to the heart of the transaction. We find, as did the Trial Court, that the Estate committed a material breach of the Agreement in its failure to provide marketable title, whereas MLP's breaches were non-material in nature.

Finally, Defendants argue they lacked notice of cloud of title until it was too late to act. Defendants contend they first became aware of Charles Mounger's claims at the October 31, 2007 meeting with MLP. Defendants state: "The clear intent of Paragraph 4 [of the Agreement] was to determine as early as possible if a defect in the title existed and to notify seller of such. It is undisputed that MLP knew in early August that Charles Mounger's claims created a cloud on the title. Instead of disclosing that, MLP chose to remain silent." Defendants' characterization of the timeline as to their awareness of Charles Mounger's claims does not accord with the Trial Court's factual findings. The Trial Court found as evidence of the Estate's early notice of defect in title both the August

-15-

3, 2007 letter from Mr. Carpenter to Mr. Anderson and an August 9, 2007 email forwarded by Harlon Rice to co-executor Katherine Lasater.

Defendants contend that the August 3, 2007 letter is silent about any claims of ownership by Charles Mounger and cannot be used to establish notice. However, we believe that is an overly restrictive reading of the letter. The letter references Charles Mounger having ran a geotechnical person off the property and included a commitment to take legal action, such as obtaining a restraining order, to prevent future occurrences. The letter reflects that Charles Mounger believed, incorrectly as it turned out, he had some right to the property. That whatever this right or interest was supposed to be was not spelled out in the letter does not mean the Estate was ignorant of a problem. We agree with the Trial Court that the August 3, 2007 letter was sufficient to put the Estate on notice of Charles Mounger's claims on the property. Regarding Rice's forwarded email, Defendants note Katherine Lasater's testimony that she received it in 2010, not 2007. Defendants point out that Rice testified via deposition, and we are not constrained to defer to the Trial Court's credibility determinations as to him. However, Katherine Lasater did testify in person, and we are constrained to defer to the Trial Court's implicit assessment of her credibility. The Trial Court's ruling makes it clear it did not credit Katherine Lasater's testimony with regard to when she was first notified of Charles Mounger's claims. The evidence does not preponderate against the Trial Court's factual findings, and no clear and convincing evidence exists that would overturn the Trial Court's implicit credibility determinations. MLP's notice was at least substantially compliant in that the Estate had actual notice of Charles Mounger's claims. The evidence does not preponderate against the Trial Court's findings as to the Estate's notice of Charles Mounger's claims. At oral argument in this matter, Defendants' counsel acknowledged forthrightly that if we affirm the Trial Court's finding that the Estate knew of Charles Mounger's claims in August 2007, Defendants lose. We do so affirm that finding by the Trial Court, and Defendants lose on this issue.

In sum, the Estate committed the first and only material breach of the Agreement in this case. The Estate was on notice of Charles Mounger's claims no later than August 3, 2007. The Estate then acted to remove the cloud on title, but it was too late. Like the Trial Court, we find no bad faith on the Estate's part, but the fact remains it failed to provide marketable title in time to fulfill the terms of the Agreement. We affirm the Trial Court in its conclusion that the earnest money is to be returned to Plaintiff.

We next address whether the Trial Court erred in applying equitable principles to award Plaintiff the earnest money in a breach of contract case. Defendants argue (1) that the Trial Court erred in relying on principles of equity in a breach of contract case; and (2) if equity is to be considered, the equities do not favor MLP. With regard to the consideration of equity in breach of contract cases, this Court has stated: "The rights of the parties are to be determined from the contracts into which they entered and the

-16-

consequences of those contracts and not from some generalized concepts of equity." *Craft v. Forklift Systems, Inc.*, No. M2002-00040-COA-R3-CV, 2003 WL 21642767, at *3 (Tenn. Ct. App. July 14, 2003), *no appl. perm. appeal filed* (quoting *Norcomo Corp. v. Franchi Construction Co., Inc.*, 587 S.W.2d 311, 317 (Mo. Ct. App. 1979)). To the extent the Trial Court erred in holding forth on the equities, the error was harmless because the Trial Court already had decided the case on contractual principles. Nevertheless, were the equities to be considered, we disagree with Defendants as to which party that would favor. The Estate retained the real property. The Estate kept the earnest money, as well. The Estate also obtained a judgment against Charles Mounger for six million dollars. This case can be, and was, resolved on contractual principles, but if the equities were to be considered, they would favor Plaintiff rather than Defendants.

We next address whether the Trial Court erred in awarding Plaintiff attorney's fees incurred in the appeal of *Bowers I* when Plaintiff did not seek recovery of those fees in this Court in that appeal. In *In re Estate of Dunlap*, No. W2010-01516-COA-R9-CV, 2011 WL 1642577 (Tenn. Ct. App. April 29, 2011), *no appl. perm. appeal filed*, this Court discussed when a litigant must ask for appellate attorney's fees. In at least one scenario, no first request to this Court is necessary. For example, with regard to attorney's fees incurred on appeal by an estate's administrator, "the estate's attorney need not request such fees in the appellate court, and indeed would not make such a request in the first instance to the appellate court." *In re Estate of Dunlap*, 2011 WL 1642577, at *5. However, this Court also reiterated the general rule: "[I]n most instances, a claim for appellate attorney fees must first be made in the appellate court, as with a request for appellate attorney's fees based on a statutory or contractual right, or on the allegation that the appeal was frivolous.[1]" *Id*. at *4 (footnote in original but renumbered).

Plaintiff asserts that he was not entitled to his attorney's fees in *Bowers I* because that appeal dealt simply with his standing rather than the merits of the case. Plaintiff continues: "Now that he has prevailed pursuant to the merits of the claim, he is entitled to all the attorney's fees related to bringing the action, including the fees incurred based on the appeal in *Bowers I*." We disagree. Regardless of the fact that *Bowers I* concerned standing and not the underlying merits, Plaintiff's whole basis for an award of attorney's fees in this matter is Paragraph 9 of the Agreement. This Court has explained that appellate attorney's fees based on a contractual right must be requested in the first instance from this Court. Plaintiff did not make such a request for the appellate attorney's fees at issue. We,

---

[1] Generally, Tennessee follows the American Rule, under which litigants must pay their own attorney fees unless there is a statute or contract providing otherwise. *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005). In the absence of such a fee-shifting statute, contract provision, or other recognized equitable ground, courts may not compel a losing party to pay the attorney fees of the winning party. *Brown & Williamson Tobacco Corp.*, 18 S.W.3d at 194; *Kultura, Inc. v. S. Leasing Corp.*, 923 S.W.2d 536, 540 (Tenn. 1996).

therefore, reverse the Trial Court's award to Plaintiff of his attorney's fees incurred in *Bowers I*.

Continuing our review, Defendants request their appellate attorney's fees, should they prevail. As discussed herein, Defendants have not prevailed. In addition, Defendants did not identify this as an issue in their statement of issues. We decline Defendants' request for an award of attorney's fees incurred on appeal.

Having addressed Defendants' issues, we address Plaintiff's separate issues. Our resolution of Defendants' issues is dispositive of this appeal. We therefore decline to address Plaintiff's separate issues (1) and (2) as they are unnecessary to reach. In Plaintiff's third separate issue, he requests his appellate attorney's fees pursuant to Paragraph 9 of the Agreement. As Plaintiff has prevailed, and he has successfully raised the issue with this Court, we agree he is entitled to an award of appellate attorney's fees pursuant to the Agreement. On remand, the Trial Court is to determine and enter an award to Plaintiff of his reasonable attorney's fees incurred on this current appeal.

## Conclusion

The judgment of the Trial Court is affirmed, in part, and reversed, in part, and this cause is remanded to the Trial Court for collection of the costs below and further proceedings consistent with this Opinion. The costs on appeal are assessed 50% against the Appellants, the Estate of Katherine N. Mounger, Katherine Mounger Lasater, and E. Jay Mounger, and their surety, if any, and 50% against the Appellee, Nelson E. Bowers, II.

_____
D. MICHAEL SWINEY, CHIEF JUDGE